## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ALLISON M., CHRISOPHER M., and C.M.,<br><br>              Plaintiffs,<br><br>v.<br><br>THE MUELLER INDUSTRIES, INC.<br>WELFARE BENEFIT PLAN,<br><br>              Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' [34] [36] CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:23-cv-00421<br><br>District Judge David Barlow<br><br>Magistrate Judge Dustin B. Pead |

Before the court are the parties' cross-motions for summary judgment.[1] Plaintiffs Allison M., Christopher M., and C.M. (collectively, "Plaintiffs") sued Defendant The Mueller Industries, Inc. Welfare Benefit Plan ("the Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA").[2] Plaintiffs have abandoned their MHPAEA claim,[3] and therefore the court only considers their ERISA claim. For the reasons below, the court grants the motions in part and denies them in part.

## BACKGROUND

### *Plan Structure, Coverage, and Level of Care Guidelines*

Plaintiffs Allison M. and Christopher M. participated in an employee welfare group health insurance plan ("Mueller" or "the Plan") governed by ERISA.[4] As their dependent,[5] C.M.

---

[1] Def.'s Mot. Summ. J. ("Def.'s MSJ"), ECF No. 34, filed August 26, 2024; Pls.' Mot. Summ. J. ("Pls.' MSJ"), ECF No. 36, filed August 27, 2024.

[2] Compl., ECF No. 4, filed July 10, 2023.

[3] *See* Pls.' Reply in Support of Pls.' MSJ ("Pls' Reply") 18, ECF No. 56, filed December 17, 2024 ("Plaintiffs do agree they abandoned their Parity Claims.").

[4] Def.'s MSJ 3.

[5] Allison M. and Christopher M. are C.M.'s parents.

was a beneficiary under the Plan.[6] Under the Plan, Mueller is the plan administrator and has delegated its fiduciary authority to BlueCross BlueShield of Tennessee ("BlueCross") as third-party administrator.[7]

The Plan covers treatment for varying levels of outpatient and inpatient Behavioral Health Services.[8] Outpatient care is the least restrictive and applies when the beneficiary is not confined in a hospital.[9] Outpatient care includes partial hospitalization services, as well as intensive outpatient programs ("IOP").[10] On the other hand, inpatient mental health treatment is the most restrictive and covers services that are provided by a hospital when a beneficiary is confined in a hospital for treatment and evaluation of mental health and substance use disorders.[11] Inpatient care includes treatment at a Residential Treatment Center ("RTC") for subacute care,[12] although the Plan does not define "residential treatment." Treatment for custodial or domiciliary care, vocational and educational training and/or services, and conditions without recognizable International Classification of Disease codes, such as self-help programs, are excluded from coverage.[13] Custodial care is defined as "[a]ny services or supplies provided to assist an individual in the activities of daily living as determined by the Plan including but not limited to eating, bathing, dressing or other self-care activities."[14]

The Plan sets forth the terms and conditions of coverage through a document titled, "Evidence of Coverage" ("EOC"). The EOC defines Medically Necessary services as:

> Procedures, treatments, supplies, devices, equipment, facilities or drugs (all services) that a medical Practitioner, exercising prudent clinical judgment, would

---

[6] Def.'s MSJ 3.
[7] Administrative Record ("Rec.") 9, ECF No. 29–32, filed August 23, 2024.
[8] *See* Rec. 62–63.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] Rec. 71.
[13] Rec. 63.
[14] Rec. 43.

provide to a Member for the purpose of preventing, evaluating, diagnosing or treating an illness, injury or disease or its symptoms, and that are: (1) in accordance with generally accepted standards of medical practice; and (2) clinically appropriate in terms of type, frequency, extent, site and duration and considered effective for the Member's illness, injury or disease; and (3) not primarily for the convenience of the Member, physician or other health care Provider; and (4) not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Member's illness, injury or disease.[15]

If a beneficiary disagrees with an initial coverage determination, the Plan provides an internal appeal process.[16] If the beneficiary's claim is again denied, the beneficiary may either appeal through an external review program or bring legal action.[17]

*Admission and Care at Blue Ridge*

On December 18, 2020, C.M. enrolled in Blue Ridge Therapeutic Wilderness ("Blue Ridge").[18] On December 28, 2020, C.M. underwent an Intake Assessment taken by Lorena Bradley, Ph.D., a licensed psychologist ("Dr. Bradley").[19] C.M.'s Master Treatment Plan, dated January 15, 2021, describes Blue Ridge's program information. It states, among other things, that students enrolled at Blue Ridge are under the care of a licensed medical doctor, who visits each group every three weeks.[20] The doctor also monitors daily medication intake and medical symptoms which are relayed to him from the medical coordinator, who receives twice daily updates from the field.[21] The Master Treatment Plan lists four "diagnostic impressions," including (i) Attention-deficit/hyperactivity disorder. Predominantly inattentive presentation;

---

[15] Rec. 46.
[16] Rec. 38.
[17] *Id.*
[18] Rec. 1158. The parties and various documents also refer to Blue Ridge by its former name "Second Nature Blue Ridge." *E.g.*, Rec. 8417.
[19] Rec. 1149.
[20] Rec. 1064.
[21] Rec. 1064.

3

(ii) social anxiety disorder; (iii) cannabis use disorder, mild; and (iv) major depressive disorder, recurrent episode, mild.[22]

On February 23, 2021, C.M. underwent a Psychological Assessment Report conducted by Dr. Bradley.[23] In this Assessment, Dr. Bradley recommended that C.M. "gain additional therapeutic and residential treatment" following his discharge from Blue Ridge.[24] On March 4, 2021, C.M. discharged from Blue Ridge.[25] The Discharge Summary was completed by Tim Riewald, a Licensed Professional Counselor Associate and C.M.'s primary therapist.[26] In this Discharge Summary, Mr. Riewald opined as to C.M.'s progress in different areas. Although Mr. Riewald generally offered positive remarks regarding C.M.'s progress, he also found:

> Social Skills: C.M. "continues to struggle in terms of overall ability to interact appropriately with others and display appropriate self-management skills. Further support and practice in this area is highly recommended.
>
> Anxiety: C.M. "continued to display significant symptoms of anxiety during the course of treatment, and experienced mixed success in his ability to implement strategies for managing anxiety. While progress was made regarding social anxiety, he continued to struggle at times in social settings and was easily overwhelmed by peer interactions."
>
> Depression: C.M. was "receptive to this intervention but showed mixed success in his ability to implement those strategies to dispute irrational thought patterns."[27]

In a section titled "Recommendations," Mr. Riewald further stated that he

> remain[ed] concerned regarding [C.M.]'s risk for relapsing in the areas of conduct problems, social difficulties, depressive symptoms, anxiety and substance abuse if he were to return to his home environment after completing our program. I believe that if any long-term gains are to be made, he must be in a residential or therapeutic boarding school setting after Blue Ridge so that he can practice and internalize the tools he learned at Blue Ridge. Returning to his home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to his previous level of

---

[22] Rec. 1062.
[23] Rec. 1113–47.
[24] Rec. 1142.
[25] Rec. 996.
[26] Rec. 1000.
[27] Rec. 997.

functioning. . . . Returning home, even for a few days, would place him at great risk for a regression in functioning and would undo much of the progress that he has made at Blue Ridge.[28]

*Admission and Care at Crossroads*

On March 5, 2021, C.M. enrolled into Crossroads Academy ("Crossroads").[29] C.M.'s

Master Treatment Plan, dated March 11, 2021, lists four diagnoses: (i) Attention-

deficit/hyperactivity disorder, predominantly inattentive presentation; (ii) social anxiety disorder

(social phobia); (iii) unspecified depressive disorder; and (iv) cannabis use disorder, moderate.[30]

On November 15, 2021, C.M. discharged from Crossroads.[31] The discharge summary noted that

C.M. made "[g]reat progress overall" but recommended "[a]fter RTC therapy."[32]

*First Denial of Benefits at Blue Ridge and Crossroads*

The court now turns to C.M.'s claims processing interactions with BlueCross, the Plan's

third-party administrator. Plaintiffs received several documents indicating that C.M.'s stay at

Blue Ridge and Crossroads were not covered "because the required authorization is not on

file."[33]

*Plaintiffs Appeal First Denial of Benefits at Blue Ridge and Crossroads*

In two letters dated February 2, 2021, Plaintiffs appealed BlueShield's denial of benefits

at Blue Ridge and Crossroads.[34] Plaintiffs argued that under the Plan, their failure to pre-

authorize coverage should only result in a deduction of benefits of 25%, up to a maximum of

---

[28] Rec. 999.
[29] Rec. 737.
[30] Rec. 737.
[31] Rec. 438.
[32] Rec. 438.
[33] *E.g.*, 916–34 (Blue Ridge), 362–82 (Crossroads).
[34] Rec. 899–906 (Blue Ridge), 344–51 (Crossroads).

$2,000 per calendar year, not a full denial of services.[35] Plaintiffs further stated that they "know that [C.M.]'s treatment at [Blue Ridge and Crossroads] was medically necessary."[36]

*BlueCross Upholds First Denial of Benefits at Blue Ridge*

In a letter dated April 7, 2022, BlueCross upheld its denial of benefits at Blue Ridge.[37] BlueCross "made this decision because [Blue Ridge] is a Wilderness Program provider and is not deemed to be an eligible provider for the services rendered, and clinical services are non-covered as not billable separately."[38]

Additionally, BlueCross sent a letter dated April 15, 2022 in response to a request from Plaintiffs in their first appeal letter for ERISA disclosure of behavioral health services.[39] The letter attached a copy of the Plan's Evidence of Coverage document, all medical records that BlueCross received and that were reviewed by a physician specializing in psychiatry, as well as the Milliman Care Guidelines ("MCG") related to the requested services.[40] The letter states that according to the MCG,

> residential care is intended for patients who require around the clock behavioral care but do not need the level of physical security and high frequency of psychiatric and medical intervention that are available on an inpatient unit.[41] Additionally, the MCG states wilderness therapy programs often do not offer the types of services that would be characteristic of a clinical residential treatment center. The American Academy of Child and Adolescent Psychiatry indicates programs that are appropriately classified as clinical residential treatment centers include the use of multidisciplinary teams that include psychologists, psychiatrists, pediatricians, and licensed therapists who consistently are involved in the patient's care.[42]

---

[35] Rec. 901, 346.
[36] Rec. 905, 349.
[37] Rec. 11803.
[38] Rec. 11803.
[39] Rec. 11499.
[40] Rec. 11499–500.
[41] Rec. 11780.
[42] Rec. 11500. *See also* Rec. 11779 (footnotes in MCG Guidelines containing quoted material); Rec. 11470 ("For patients who are deemed to require 24-hour supervised behavioral care, but who do not require restraint, voluntary residential level of care is an option.").

In addition, the letter stated that without pre-authorization, benefits for medically necessary services would be reduced by 25% of the maximum allowable charge—in line with Plaintiffs' argument in its prior letter.[43] The letter also referred to various procedure codes. Lastly, the letters referenced coverage dates spanning from December 18, 2020 to November 13, 2021. However, C.M. was enrolled in Blue Ridge from December 18, 2020 to March 4, 2021 and in Crossroads from March 5, 2021 to November 15, 2021.[44]

*Plaintiffs Appeal Second Denial of Benefits at Blue Ridge*

On June 30, 2022, Plaintiffs filed a level two appeal regarding coverage at Blue Ridge.[45] Plaintiffs made several arguments. First, they argued that the denial letter referenced services from December 18, 2020 to November 13, 2021 even though C.M. discharged from Blue Ridge on March 4, 2021. Second, Plaintiffs argued that BlueCross should have evaluated C.M.'s treatment using clinical criteria developed specifically for the outdoor behavioral health level of care—which they argue describes Blue Ridge—as opposed to residential care. Third, Plaintiffs argued that BlueCross did not identify exactly which requirements from the Plan document that Blue Ridge's care did not meet. And fourth, Plaintiffs argued that C.M.'s psychological testing services were conducted by Dr. Bradley, and thus billed on professional claim forms separately from C.M.'s stay at Blue Ridge.

---

[43] Rec. 11500.
[44] It is unclear why the letters reference coverage through November 13, 2021 when it appears that C.M. discharged from Crossroads on November 15, 2021. *See* Rec. 438. However, Plaintiffs do not provide any briefing regarding this two-day difference, nor did they mention it during the internal grievance process. *See, e.g.*, Rec. 349 (requesting level one member appeal review regarding treatment by Crossroads from March 5, 2021 through November 13, 2021).
[45] Rec. 8416–28.

*BlueCross Upholds Second Denial of Benefits at Blue Ridge[46]*

In a letter dated October 25, 2022, BlueCross upheld its second denial of benefits at Blue Ridge.[47] The letter stated that under the Plan, "custodial or domiciliary care that focuses on vocational, educational and/or self-help programming, which would apply to wild[er]ness programs, are excluded from coverage."[48] The letter further stated that benefits for out of network outpatient services are payable at 60% of the maximum allowable charge after the deductible.[49]

*BlueCross Upholds First Denial of Benefits at Crossroads*

In a letter dated August 1, 2022, BlueCross upheld its denial of benefits at Crossroads.[50] The letter reasoned that BlueCross determined that C.M.'s inpatient care was not medically necessary.[51] The letter also stated that C.M. did not obtain the required pre-authorization, but services found to be not medically necessary are excluded from coverage.[52] In support of its medical necessity determination, the letter listed C.M.'s diagnoses, his treatment goals, and noted his improvement during his three weeks of treatment at Blue Ridge, ultimately concluding that a Partial Hospital Program would be sufficient. The letter also reversed its determination that Plaintiffs' claims for psychological evaluation services at Blue Ridge were "clinical services [and thus] non-covered as not billable separately." BlueCross included the MCG medical criteria for "Attention-Deficit and Disruptive Behavior Disorders: Residential Care."[53]

---

[46] In this same letter, BlueCross upheld its second denial of benefits at Crossroads.
[47] Rec. 11460–61. The letter erroneously swapped the names of Blue Ridge and Crossroads when describing the reasons for denial.
[48] Rec. 11461.
[49] Rec. 11461.
[50] Rec. 5311–13.
[51] Rec. 5311.
[52] Rec. 5311.
[53] Rec. 5311–12.

*BlueCross Upholds Second Denial of Benefits at Crossroads*

Despite no appeal by Plaintiffs of the August 1, 2022 letter denying coverage of benefits at Crossroads, on October 25, 2022, BlueCross issued another letter denying coverage for lack of medical necessity:

> After review of the available medical records, the medical director indicated the member was medically stable and was not an imminent danger to himself or others. He was not hearing or seeing things that were not present and did not have delusions, fixed beliefs about things that were not true. There were no changes in weight or sleep disruption threatening his physical functioning, and he was able to function in a specialized school setting and had adequate academic performance and had not avoided almost all interactions. The member did not need withdrawal management and there were no reported withdrawal symptoms or cravings. Impairments of judgment, assessment of consequence of his actions, impulse control and family relationships were problematic for the member, but management was feasible in a lower level of care as he was willing to participate in counseling, academic assignments, and other therapeutic interventions according to the provided medical records. The member had adequate family support and did not need daily medical or nursing monitoring. The medical director further indicated partial programming, which is an intensive outpatient program that operates 3-5 days a week at 4-6 hours per day is the recommended starting level of care and could have provided individual, group and family therapy for all of the member's behavioral health disorders. The medical director noted a higher level of care would be the next step if the member failed to respond to partial programming in a licensed residential treatment program.[54]

The letter also enclosed the Milliman Care Guidelines, Attention-Deficit and Disruptive Behavioral Disorders: Residential Care, Anxiety Disorders: Residential Care, Major Depressive Disorder: Residential Care, and Substance-Related Disorders: Residential Care, which "helps explain[] the basis o[f] this denial in more detail."[55]

*Plaintiffs Submit Request for Independent Review of Denial of Coverage at Crossroads*

On February 6, 2023, Plaintiffs requested a full independent review of the adverse benefit determination at Crossroads.[56] In this letter, they argued that the August 1, 2022 denial letter

---

[54] Rec. 11460–62. This letter also upheld the denial of coverage at Blue Ridge, as discussed above.
[55] Rec. 11460.
[56] Rec. 3728–47.

(i) did not provide the requested documentation and BlueCross's rationale, (ii) did not mention who conducted the review or their credentials; (iii) did not reference any medical records used in determining the medical necessity of C.M.'s treatment; and (iv) did not engage in a meaningful dialogue about C.M.'s need for treatment, and instead made conclusory statements without evidence.[57]

Plaintiffs also argued that Level Two Grievance Committee conducted an additional review of the case (resulting in the October 25, 2022 letter) without Plaintiffs' knowledge.[58] Plaintiffs contended that it remained unclear what was reviewed and by whom.[59] Additionally, they pointed out that "the description of services and symptoms [C.M.] was experiencing appear to *actually* be referencing [C.M.]'s treatment at Crossroads" even though it referred to Blue Ridge.[60] Although the letter discussed denial reasons for both Blue Ridge and Crossroads, Plaintiffs surmised that BlueCross "confused our level one appeal for Crossroads, submitted on February 2, 2022, and our appeal for Blue Ridge and the psychological testing services . . . which we submitted on June 30, 2022.[61] Next, Plaintiffs argued that BlueCross should have applied the MCG general residential treatment criteria for children and adolescents, as opposed to one specific to attention-deficit/hyperactivity disorder, particularly when C.M. has multiple co-occurring conditions.[62] Further, Plaintiffs argued that C.M. met the MCG guidelines for admission because (i) he was struggling with moderately severe attention-deficit/hyperactivity disorder, social phobia, and major depressive disorder—all of which were causing him to experience serious dysfunction in his daily living—(ii) he failed to respond to any lower levels of

---

[57] Rec. 3736.
[58] Rec. 3736.
[59] Rec. 3737.
[60] Rec. 3738.
[61] Rec. 3738.
[62] Rec. 3742.

care, and (iii) he was struggling with severe functional impairment and engaging in escalating and dangerous impulse behaviors.[63]

Plaintiffs then described C.M.'s behavioral and treatment history.[64] Plaintiffs stated that between 2016 and 2020, they took C.M. to several different therapists, but C.M. did not like going and was consistently nonresponsive during sessions.[65] In late 2020, C.M.'s parents visited a therapeutic day school to see about enrolling him there, but the school "didn't think [C.M.] was a good fit for their program and that he needed more help than they could provide."[66]

Finally, Plaintiffs requested that the assigned reviewer be a board-certified psychiatrist with experience treating adolescents with attention-deficit/hyperactivity disorder, social phobia, major depressive disorder, and other high-risk behaviors in a residential treatment setting.[67]

*Independent Review Upholds Denial of Coverage at Crossroads*

In a letter dated March 23, 2023, the independent reviewer—who specializes in General Psychiatry, Child and Adolescent Psychiatry—upheld BlueCross's denial of coverage of benefits at Crossroads due to lack of medical necessity.[68] The independent reviewer explained:

> The member had already completed three months of residential treatment care (RTC) interventions and was displaying clinical improvement that no longer warranted further RTC. Given he required ongoing work with sobriety and anxiety, continued motivational interviewing, individual, group, and family work could have been considered at an intensive outpatient program or partial hospitalization program level of care. Psychological testing conducted on 01/26/21 was not medically necessary for dates of service 03/05/21-11/13/21. It was a clinical service provided while the member was at another RTC program.[69]

---

[63] Rec. 3742–43.
[64] Rec. 3743–46.
[65] Rec. 3743–44.
[66] Rec. 3745.
[67] Rec. 3729.
[68] Rec. 7523–26.
[69] Rec. 7524.

*Procedural Posture*

Plaintiffs filed their Complaint on July 10, 2023.[70] The Plan filed its Answer on October 27, 2023.[71] In August 2024, the parties filed cross Motions for Summary Judgment, which were fully briefed on December 17, 2024.[72]

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[73] "Where, as here, the parties in an ERISA case both moved for summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[74]

## DISCUSSION

The parties move for summary judgment on Plaintiffs' two claims: denial of benefits and an alleged MHPAEA violation. However, Plaintiffs have abandoned their MHPAEA claim.[75] Therefore, the court only considers their ERISA claim for improper denial of benefits.

---

[70] Compl., ECF No. 4.
[71] ECF No. 12.
[72] Def.'s MSJ; Pls.' MSJ; Def.'s Opp'n to Pls.' MSJ ("Def.'s Opp'n"), ECF No. 47, filed November 5, 2024; Pls.' Opp'n to Def.'s MSJ ("Pls.' Opp'n"), ECF No. 46, filed November 5, 2024; Def.'s Reply in Further Supp. of Its MSJ ("Def.'s MSJ Reply"), ECF No. 55, filed on December 17, 2024; Pls.' Reply in Further Supp. of Their MSJ ("Pls. MSJ Reply"), ECF No. 56, filed on December 17, 2024.
[73] Fed. R. Civ. P. 56(a).
[74] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).
[75] *See* Pls.' Reply 18 ("Plaintiffs do agree they abandoned their Parity Claims.").

## I.    Denial of Benefits Claim

ERISA "sets minimum standards for employer-sponsored health plans[.]"[76] Congress

enacted the regulations "to promote the interests of employees and their beneficiaries in

employee benefit plans, and to protect contractually defined benefits."[77] For this reason, "ERISA

represents a careful balancing between ensuring fair and prompt enforcement of rights under a

plan and the encouragement of the creation of such plans."[78] The court first addresses the proper

standard of review.

### A.    Standard of Review

Under 29 U.S.C. § 1132(a)(1)(b), a civil action may be brought by an insurance plan

participant to recover benefits under the terms of the plan. The Supreme Court has held that "a

denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless

the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."[79]

Where the plan administrator has discretionary authority, courts "employ a deferential

standard of review, asking only whether the denial of benefits was arbitrary and capricious."[80]

Defendants carry the burden to demonstrate that the arbitrary and capricious standard applies.[81]

Courts will uphold the administrator's determination "so long as it was made on a reasoned basis

and supported by substantial evidence."[82] "Substantial evidence requires more than a scintilla but

---

[76] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023).
[77] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (citation omitted).
[78] *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (internal quotation marks omitted) (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)).
[79] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Foster v. PPG, Inc.*, 683 F.3d 1223, 1231 (10th Cir. 2012).
[80] *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1195 (D. Utah July 28, 2023) (quoting *LaAsmar*, 605 F.3d at 796).
[81] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1019 (D. Utah 2021).
[82] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

less than a preponderance."[83] Substantial evidence is "'such evidence that a reasonable mind might accept as adequate to support a conclusion reached by the decision-maker.'"[84]

"In determining whether the evidence in support of the administrator's decision is substantial, [courts] must take into account whatever in the record fairly detracts from its weight."[85] Plan administrators may not arbitrarily refuse to engage with a claimant's reliable evidence—including the opinions of a treating physician.[86] However, "a benefits decision can be reasonable even when the insurer receives evidence contrary to the evidence it relies upon."[87] An administrator also may not arbitrarily refuse to credit evidence that may confirm a beneficiary's theory of entitlement.[88] Thus, if a treating physician's evaluation confirms a claimant's theory of entitlement, an administrator may not arbitrarily refuse to "engage with and address" such an evaluation.[89] "[R]eviewers cannot shut their eyes" to reliable evidence and ignore it.[90]

Arbitrary and capricious review considers whether the decision had a reasoned basis that is supported by substantial evidence.[91] This includes whether the decision is "consistent with any prior interpretations by the plan administrator, is reasonable in light of any external standards, and is consistent with the purposes of the plan."[92] "Consistent with the purposes of the plan requirements means that a plan administrator acts arbitrarily and capriciously if the administrator

---

[83] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).
[84] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).
[85] *David P.*, 77 F.4th at 1308.
[86] *Black & Decker*, 538 U.S. at 834.
[87] *David P.*, 77 F.4th at 1308.
[88] *D.K.*, 67 F.4th at 1237 (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).
[89] *Id.* (citing *Black & Decker*, 583 U.S. at 834).
[90] *David P.* 77 F.4th at 1310–11.
[91] *D.K.*, 67 F.4th at 1236.
[92] *Id.*

'fails to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'"[93]

The EOC states, in part:

[Mueller] has delegated discretionary authority to make any benefit determinations to BlueCross, [Mueller] also has the authority to make any final Plan determination. [Mueller], as the Plan Administrator, and BlueCross also have the authority to construe the terms of Your Coverage. The Plan and BlueCross shall be deemed to have properly exercised that authority unless it abuses its discretion when making such determinations, whether or not [Mueller]'s benefit plan is subject to ERISA. [Mueller] has the authority to determine whether You or Your dependents are eligible for Coverage.[94]

. . .

While BlueCross has the authority to make benefit determinations and interpret the terms of Your Coverage, [Mueller], as the Plan Administrator as that term is defined in ERISA, has the discretionary authority to make the final determination regarding the terms of Your Coverage ("Coverage Decisions.") Both BlueCross and [Mueller] make Coverage Decisions based on the terms of this EOC, the ASA, BlueCross' internal guidelines, policies, procedures, and applicable state or federal laws. [Mueller] retains the authority to determine whether You or Your dependents are eligible for Coverage.[95]

Plaintiffs acknowledge this discretionary language but argue that the court should nonetheless apply de novo review because the decisions rendered by BlueCross were not a valid exercise of discretion.[96] They contend that BlueCross forfeited its deference by failing to engage in a meaningful dialogue via two untimely denial letters, as well as by committing various procedural violations.

### 1.    *Untimely Denial Letters*

In support of the former, Plaintiffs cite to *Gilbertson v. Allied Signal, Inc.*,[97] which stated that although lateness by itself does not result in a de novo standard of review, the deadlines play

---

[93] *Id.* (quoting *Tracy O. v. Anthem Blue Cross & Life Health Ins.*, 807 Fed. Appx. 845, 854 (10th Cir. 2020).
[94] Rec. 9.
[95] Rec. 104.
[96] Pls.' MSJ 15.
[97] 328 F.3d 625 (10th Cir. 2003).

a crucial role in ERISA's meaningful dialogue requirement.[98] It reasoned that it would be "manifestly unfair to claimants if plan administrators could extend the process indefinitely by continually requesting additional information."[99] Relying on *Gilbertson*, the Tenth Circuit in *Rasenack v. AIG Life Ins. Co.*[100] held that "when an administrator violates the statutory deadlines incorporated into the plan, *Firestone* deference no longer applies."[101]

However, these cases are not comparable. The facts in *Gilbertson* were egregious. After the claimant submitted her records and request for review in good faith, the plan administrator did not respond for more than six months and did not issue a determination, despite several follow up letters from the claimant's attorney.[102] After six months, the plan administrator ordered additional tests for the claimant to take with no additional explanation as to why they were needed.[103] On that record, the Tenth Circuit found de novo review appropriate. Similarly, in *Rasenack v. AIG Life Ins. Co.*,[104] the plan administrator denied a claim eight months after a reviewing physician submitted an opinion letter requested by the administrator and denied an appeal seven months after it was filed and three months after a reviewing physician submitted a report.[105] The Tenth Circuit found that the delays were not excusable and held that de novo review was appropriate.[106]

In the instant case, Plaintiffs and BlueCross engaged in an ongoing exchange of information concerning the determination of Plaintiffs' Crossroads claims. On May 19, 2022,

---

[98] *Id.* at 635–36.
[99] *Id.* at 636.
[100] 585 F.3d 1311 (10th Cir. 2009).
[101] *Id.* at 1316.
[102] *Gilbertson*, 328 F.3d at 636.
[103] *Id.* at 636.
[104] 585 F.3d 1311 (10th Cir. 2009).
[105] *Id.* at 1317.
[106] *Id.*

Plaintiffs enquired about the status of the claims submitted on February 2, 2022.[107] The BlueCross grievance specialist "reviewed the file and confirmed that the appeal for Blue Ridge was received; however, there were no records of the form being received for Crossroads Academy."[108] Following this exchange, BlueCross sent Plaintiffs' claims to a "claims department technical team expert for additional review," opened a "grievance reconsideration" for the Crossroads claims, and submitted those claims for Level One medical necessity review.[109] As to Blue Ridge, Plaintiffs submitted a second appeal letter dated June 30, 2022. BlueCross rendered a benefits determination on October 25, 2022. Although both of these letters were late, BlueCross's conduct was not of the level that the Tenth Circuit has found results in a de novo standard of review. On this record, the court finds that the lateness of these letters does not require do novo review.

### 2.    Alleged Procedural Violations

Second, Plaintiffs argue that certain procedural violations necessitate de novo review, such as by switching the bases of denial in every letter, confusing the Blue Ridge and Crossroads claims in its final letter, and conducting an unauthorized second review of C.M.'s treatment at Crossroads, among others.[110] These first two arguments overlap, as BlueCross's typographical error confusing the Blue Ridge and Crossroads facilities resulted in the alleged switched bases of denial. For example, Plaintiffs argue that BlueCross switched the basis of denial in its October 25, 2022 denial letter by stating that coverage at Blue Ridge was initially denied for lacking authorization and deemed not medically necessary,[111] while coverage at Crossroads was initially

---

[107] Rec. 8409.
[108] Rec. 8409.
[109] Rec. 8410, 6683–87.
[110] Pls.' MSJ 16.
[111] Pls.' MSJ 21 (citing Rec. 11460).

denied because it offered wilderness treatment services.[112] But it is clear that BlueCross simply erroneously swapped the names of the two facilities. Plaintiffs acknowledge this in their Independent Review Request[113] and in their motion.[114] Such a scrivener's error—particularly when it does not impede one's understanding of the denial of coverage—does not warrant de novo review.

Neither does the October 25, 2022 letter regarding Crossroads coverage, which Plaintiffs argue was unauthorized because they did not engage in a second internal appeal.[115] If the court were to provide a remedy for an unauthorized denial letter, the court would exclude the letter from its consideration, not provide de novo review. Further, BlueCross's Level Two denial did not prejudice Plaintiffs' ability to appeal the decision via Independent Review. In any event, whether the court considers the "unauthorized" letter has no effect on the court's decision because, as discussed *infra*, BlueCross's denial of Crossroads coverage was arbitrary and capricious.

Plaintiffs also argue that de novo review should apply because BlueCross's August 1, 2022 denial for Crossroads "focused exclusively on C.M.'s ADHD diagnosis."[116] The letter stated, "Uphold the denial for ADHD: residential care for dates of service 3.05.21–11.13.21 based on lack of clinical necessity for this level of care with treatment goals available at a lower level such as a Partial Hospital Program."[117] The letter also included "the MCG medical criteria

---

[112] Pls.' MSJ 24 (citing Rec. 11461).

[113] Rec. 3738 (stating that the October 25, 2022 letter's description of Blue Ridge services "appear to actually be referencing [C.M.]'s treatment at Crossroads").

[114] Pls.' MSJ 24 ("It is obvious the 'Level II Committee' confused Crossroads with Blue Ridge in making this decision.").

[115] Pls.' MSJ 23–25.

[116] Pls.' MSJ 22–23.

[117] Rec. 5312.

on this service," titled "Attention-Deficit and Disruptive Behavior Disorders: Residential Care."[118]

However, the physician review cited in the denial letter references each of C.M.'s diagnoses, including ADHD, "social anxiety disorder, unspecified depressive disorder, and cannabis use disorder, moderate."[119] Further, there is no indication that the letter's conclusion that C.M. could have received treatment at a lower level of care was dependent solely on C.M.'s ADHD diagnosis. Moreover, the October 25, 2022 denial letter also recommended partial programming "for all of [C.M.]'s behavioral health disorders" and attached the MCG Guidelines for each of C.M.'s diagnoses.[120] That one sentence referencing only ADHD is insufficient on these facts to warrant de novo review, especially when followed by two additional denial letters.

Next, Plaintiffs argue that only Mueller, not BlueCross, is authorized under the Plan to make a final Plan determination.[121] In support, they point to excerpts of the Plan, which state: "[Mueller has delegated discretionary authority to make any benefit determinations to BlueCross, [Mueller] also has the authority to make any final Plan determination,"[122] and "While BlueCross has the authority to make benefit determinations and interpret the terms of Your Coverage, [Mueller], as the Plan Administrator . . . has the discretionary authority to make the final determination regarding the terms of Your Coverage."[123]

This is an incorrect reading of the Plan. The Plan expressly vests BlueCross with the authority "to make any benefit determinations," which necessarily includes final determinations. This is evidenced by the plain text. The Plan provides that Mueller "also" has the option to

---

[118] Rec. 5312.
[119] Rec. 5311.
[120] Rec. 11460–61.
[121] Pls.' MSJ 24–25.
[122] Rec. 9.
[123] Rec. 104.

exercise its discretionary authority to make a final benefit determination, such as in the event it disagrees with a final benefit determination made by BlueCross. This language does not require Mueller to make every final benefit determination.

Additionally, Plaintiffs contend that BlueCross's decision to initially deny coverage based on a failure to preauthorize results in de novo review.[124] Although BlueCross was clearly wrong in denying benefits solely based on failure to preauthorize based on the terms of the Plan, when Plaintiffs pointed this out on appeal, BlueCross corrected its error. This form of dialogue between the parties comports with ERISA and is a reason why the internal appeals process exists.[125] It is not a basis for de novo review on this record.

Lastly, Plaintiffs assert that BlueCross's decision not to cover a "wilderness program" necessarily relied on extra-contractual terms of which BlueCross did not have discretionary authority to interpret.[126] Under the Plan, "Covered Services" for behavioral health encompass "[i]npatient services for care and treatment of mental health and substance use disorders," including residential treatment.[127] The Plan excludes from coverage custodial or domiciliary care, vocational and educational training and/or services, and conditions without recognizable International Classification of Disease codes, such as self-help programs.[128] BlueCross determined that treatment at Blue Ridge, a wilderness program, was excluded from coverage under these exclusions.

Plaintiffs argue that because "the word 'wilderness' does not appear anywhere in the EOC/Plan," "[a]ny exclusion based on a facility being a 'Wilderness Program' must necessarily

---

[124] Pls.' MSJ 16–17.
[125] Of course, the result could differ if BlueCross continued to change its bases for denial throughout multiple letters.
[126] Pls.' MSJ 17–20.
[127] Rec. 63, 71.
[128] Rec. 63.

come from an extra-contractual [source].”[129] Plaintiffs also argue that because BlueCross only has authority to make benefit determinations and interpret the terms of “*Your Coverage*,” it does not have authority to rely on any outside guidelines.

However, the Plan expressly vests BlueCross with the “authority to construe the terms of Your Coverage,” including what is covered under inpatient services for care and treatment of mental health and substance use disorders and its exclusions.[130] Further, the Plan states that BlueCross has the authority to “make Coverage Decisions based on the terms of this EOC, the ASA, *BlueCross’ internal guidelines*, policies, procedures, and applicable state or federal laws.”[131] Here, the Plan explicitly acknowledges that BlueCross makes Coverage Decisions based on internal guidelines, among other sources.[132] Plaintiffs have not demonstrated that BlueCross acted outside its discretionary authority in interpreting the Plan based on the terms of the EOC and the MCG Guidelines[133] to not cover treatment at most wilderness programs, including Blue Ridge.

Accordingly, because the Plan vests discretionary authority in BlueCross and Plaintiffs’ arguments as to why de novo review should nevertheless apply are unavailing, the court will review BlueCross’s benefit determinations under an arbitrary and capricious standard of review.

---

[129] Pls.’ MSJ 19.
[130] Rec. 9, 63.
[131] Rec. 104, 210 (emphasis added).
[132] *See Weiss v. Banner Health*, 416 F. Supp. 3d 1178, 1186 (D. Colo. 2019), *aff’d*, 846 F. App’x 636 (10th Cir. 2021) (“Courts have long recognized that an administrator may establish and rely on procedures or guidelines so long as they reasonably interpret the plan.”).
[133] The MCG Guidelines explain that “wilderness therapy programs . . . often do not offer the types of services that would be characteristic of a clinical residential treatment center.” Rec. 11500, 11779. The Guidelines further state that residential care staffing should include a qualified primary care provider who is available 24 hours a day. *Id.* In contrast, at Blue Ridge, a licensed medical doctor visits every three weeks. Rec. 4205.

**B.      ERISA's Claim Processing Requirements**

ERISA sets minimum requirements for employer-sponsored health plans, which may be administered by a third party.[134] "Administrators, like [BlueCross], are analogous to trustees of common-law trusts and their benefit determinations constitute fiduciary acts."[135] Thus, administrators owe a special duty of loyalty to plan beneficiaries in determining benefit eligibility.[136]

"ERISA promotes the interests of plan participants and beneficiaries and contractually defined benefits 'in part by regulating the manner in which plans process benefits claims.'"[137] These standards constitute the minimum requirements for a plan's claims-processing procedure.[138] The procedure, set forth in 29 U.S.C. § 1133 and in related implementing regulations, require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[139] When administrators issue denial letters, they need to explain in clear language the reason(s) for their decision.[140] The Tenth Circuit has held that "the administrator must include its reasons for denying coverage in the four corners of the denial letter" because denial letters "play a particular role in ensuring full and fair review."[141] The purposes of ERISA's claim processing requirements "are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits but choose to hold that basis in reserve rather

---

[134] 29 U.S.C. § 1001; *D.K.*, 67 F.4th at 1236.
[135] *D.K.*, 67 F.4th at 1236.
[136] *Id.* (quoting *Metro. Life Ins. V. Glenn*, 554 U.S. 105, 111 (2008)).
[137] *David P.*, 77 F.4th at 1299 (quoting *Black & Decker*, 538 U.S. at 830).
[138] *Id.*
[139] *Id.* at 1300.
[140] *D.K.*, 67 F.4th at 1239 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).
[141] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1219 (10th Cir. 2023).

than communicate it to the beneficiary."[142] Thus, when an administrator holds in reserve a basis for providing benefits, the administrator prevents a full and meaningful dialogue.[143]

"[I]f the plan administrators believe that more information is needed to make a reasoned decision, they must [clearly] ask for it," explaining why the information is needed.[144] If they deny benefits based on the text of the plan, they must cite to the specific provisions of the plan.[145] And if plan administrators deny benefits based on their scientific or clinical judgment of the claimant's circumstances, they must explain their reasoning as applied to the terms of the plan.[146]

Relatedly, ERISA sets out minimum requirements for the appeals procedure for members to challenge initial denial decisions.[147] A plan's review procedures must "'afford a reasonable opportunity to any participant whose claim for benefits has been denied [to receive a] full and fair review . . . .'"[148] ERISA's "full and fair review" creates a procedure by which claimants receive letters "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and . . . having the decision-maker consider the evidence presented by both parties prior to reaching and rendering [its] decision."[149] This includes providing claimants an "opportunity to submit written comments, documents, records, and other information relating to the claim for benefits" as well as conducting a "review that takes into account all . . . information submitted by the claimant relating to the claim."[150]

---

[142] *David P.*, 77 F.4th at 1313.
[143] *Id.*
[144] *Id*. at 1300.
[145] *David P.*, 77 F.4th at 1299 (citing 29 C.F.R. § 2560.503-1(g)(1)).
[146] *Id.*
[147] 29 U.S.C. § 1132(2).
[148] *D.K.*, 67 F.4th at 1236 (quoting 29 U.S.C. § 1133).
[149] *Id.* (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)).
[150] *David P.*, 77 F.4th at 1299 (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).

"[A]dministrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[151]

The court turns to Plaintiffs' arguments regarding BlueCross's denial of benefits at Blue Ridge and Crossroads.

### C.    Plaintiffs' Benefit Determination Arguments

Before considering whether BlueCross's denial of benefits at Blue Ridge and Crossroads was arbitrary and capricious, the court addresses Plaintiffs' preliminary arguments that the Plan may only rely on the final denials because BlueCross abandoned earlier rationales when it shifted rationales in every letter based on erroneously swapping the names of Blue Ridge and Crossroads.[152] The court has already rejected this argument; it is clear to the court—and it was clear to Plaintiffs—that BlueCross denied coverage at Blue Ridge because it is a wilderness program and denied coverage at Crossroads for lack of medical necessity, despite the typographical errors.

Plaintiffs argue that the court should remand the treatment at Blue Ridge and award benefits for the treatment at Crossroads.[153] The court considers coverage at each facility in turn.

### 1.    Blue Ridge Coverage

Plaintiffs argue that BlueCross acted arbitrarily and capriciously in (i) denying treatment at Blue Ridge for lack of medical necessity (based on erroneously swapping the names of Blue Ridge and Crossroads); (ii) making a final benefits determination more broadly, as that power is exclusively held by Mueller; (iii) incorporating extra-contractual plan terms into the terms of the Plan based on the Plan not mentioning "wilderness"; (iv) shifting rationales throughout its denial

---

[151] *D.K.*, 67 F.4th at 1242 (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705–06 (10th Cir. 2018) (unpublished)); *see David P.*, 77 F.4th at 1312.
[152] Pls.' MSJ 27–34.
[153] Pls.' MSJ 34–41.

letters; and (v) not applying the denial letters' assertions to Blue Ridge.[154] The court has already rejected the first three arguments in Section I.A.2. Therefore, the court solely considers Plaintiffs' remaining two arguments.[155]

BlueCross's first set of letters deny coverage at Blue Ridge "because the required authorization [was] not on file."[156] BlueCross's second letter, dated April 7, 2022 provides a new rationale for the denial, reasoning that "the facility is a Wilderness Program provider and is not deemed to be an eligible provider for the services rendered."[157] BlueCross's third letter, dated April 15, 2022, provides an additional rationale for why Blue Ridge, as a wilderness program, is not an eligible provider based on the MCG Guidelines.[158] Specifically, it states:

> Residential care is intended for patients who require around the clock behavioral care but do not need the level of physical security and high frequency of psychiatric and medical intervention that are available on an inpatient unit. . . .
>
> [W]ilderness therapy programs . . . often do not offer the types of services that would be characteristic of a clinical residential treatment center. The American Academy of Child and Adolescent Psychiatry indicates programs that are appropriately classified as clinical residential treatment centers include the use of multidisciplinary teams that include psychologists, psychiatrists, pediatricians, and licensed therapists who consistently are involved in the patient's care.[159]

BlueCross's fourth letter, dated October 25, 2022, provides a fourth rationale, that "custodial or domiciliary care that focuses on vocational, educational and/or self-help programming, which would apply to wildness [sic] programs, are excluded from coverage."[160] In

---

[154] Pls.' MSJ 36–37; Pls.' Opp'n to Def.'s MSJ 23–34.
[155] *See* Pls.' Opp'n to Def.'s MSJ 31–34.
[156] Rec. 916–34 (Blue Ridge).
[157] Rec. 11803.
[158] Rec. 11499–11500.
[159] Rec. 11500, 11779.
[160] Rec. 11461.

sum, BlueCross provides four different rationales as to why treatment at Blue Ridge is excluded from coverage.[161]

Additionally, none of these letters attempt to apply the Plan's terms (or the MCG Guidelines) specifically to Blue Ridge. The April 7, 2022 letter is conclusory and simply states that wilderness programs are not eligible providers. The April 15, 2022 letter provides more information, stating that wilderness programs "often" are not covered and details what clinical residential treatment centers include. But nowhere does the letter contrast why Blue Ridge specifically is not covered under the Guidelines. For example, Mueller states in briefing that unlike RTCs, which include a primary care provider who is available 24 hours a day, Blue Ridge's licensed medical doctor visits every three weeks.[162] But nowhere does BlueCross provide this information or analysis in its denial letters. Finally, the October 25, 2022 denial letter provides a conclusory statement stating that "custodial or domiciliary care that focuses on vocational, educational, and/or self-help programming, which would apply to wildness [sic] programs are excluded from coverage." But the letter does not discuss in any way which of these apply to Blue Ridge. Simply stating the applicable rule or guideline is not enough—some discussion of how it applies to the treatment is needed here.

Finally, Plaintiffs fixate on BlueCross' accidently swapping the names of Blue Ridge and Crossroads in its October 25, 2022 denial letter, repeatedly emphasizing it in their briefs. Defendant correctly notes that this error, standing alone, apparently made no real difference because the record shows Plaintiffs understood the mixed-up reference.[163] But obviously this

---

[161] The court recognizes that three of these rationales relate to Blue Ridge being a wilderness program, but the reasoning of each is distinct.

[162] Def.'s MSJ (citing Rec. 4205).

[163] *See* Rec. 3738 (stating that the October 25, 2022 letter's description of Blue Ridge services "appear to actually be referencing [C.M.]'s treatment at Crossroads"); Pls.' MSJ 24 ("It is obvious the 'Level II Committee' confused Crossroads with Blue Ridge in making this decision.").

error did not stand alone. In addition to the principal problems—the myriad shifts in denial rationales and the lack of applying the plan terms and guidelines to Blue Ridge—the denial letters also mixed up the dates of service that applied to Blue Ridge.[164] Taken together, this series of errors and deficiencies fell well below ERISA's communication requirements.

For these reasons, the court finds that BlueCross failed to engage in a meaningful dialogue with Plaintiffs regarding its denial of coverage at Blue Ridge.

### 2.  *Crossroads Coverage*

Plaintiffs argue that BlueCross's decision to deny C.M.'s coverage at Crossroads based on lack of medical necessity was arbitrary and capricious in light of C.M.'s February 23, 2021 Psychological Assessment Report, March 4, 2021 Discharge Summary, and that C.M. had already tried and failed or been turned away from lower levels of treatment.[165] In the August 1, 2022 denial letter, BlueCross found psychological testing services at Blue Ridge from December 18, 2020 through March 4, 2021 to be medically necessary.[166] Despite the medical necessity of those services at Blue Ridge, BlueCross's medical director's review determined that treatment at Crossroads from March 5, 2021 through November 13, 2021 was not medically necessary.[167] In support, the letter states that C.M. "had three weeks of a Wilderness Program and was noted to be improved with no medication trails until later and better relationship with his parents noted."[168] BlueCross's medical reviewer concluded that residential care was not "clinically necessary" to meet C.M.'s treatment goals of "reduc[ing] anxiety, family therapy, and self-awareness with work to improve communication and coping skills," and that treatment could be

---

[164] Rec. 11499 and 11803 (erroneously stating that treatment at Blue Ridge continued through November 13, 2021).
[165] Pls.' MSJ 37–41. Plaintiffs also make other arguments that the court has already rejected, such that de novo review should apply or that BlueCross "switched bases of denial" by erroneously referring to Crossroads as a wilderness program.
[166] Rec. 5312.
[167] Rec. 5311–12.
[168] Rec. 5311.

accomplished "at a lower level such as a Partial Hospital Program.[169] It also noted that a

structured setting was recommended following the psychological testing at Blue Ridge.[170]

      BlueCross's October 22, 2022 denial letter provided additional information regarding

why its medical director found C.M.'s treatment at Crossroads was not medically necessary:

> After review of the available medical records, the medical director indicated the member was medically stable and was not an imminent danger to himself or others. He was not hearing or seeing things that were not present and did not have delusions, fixed beliefs about things that were not true. There were no changes in weight or sleep disruption threatening his physical functioning, and he was able to function in a specialized school setting and had adequate academic performance and had not avoided almost all interactions. The member did not need withdrawal management and there were no reported withdrawal symptoms or cravings. Impairments of judgment, assessment of consequence of his actions, impulse control and family relationships were problematic for the member, but management was feasible in a lower level of care as he was willing to participate in counseling, academic assignments, and other therapeutic interventions according to the provided medical records. The member had adequate family support and did not need daily medical or nursing monitoring. The medical director further indicated partial programming, which is an intensive outpatient program that operates 3-5 days a week at 4-6 hours per day is the recommended starting level of care and could have provided individual, group and family therapy for all of the member's behavioral health disorders. The medical director noted a higher level of care would be the next step if the member failed to respond to partial programming in a licensed residential treatment program.[171]

      In BlueCross's final denial letter dated March 23, 2023, the independent reviewer upheld

the denial of coverage of benefits at Crossroads due to lack of medical necessity, explaining:

> The member had already completed three months of residential treatment care (RTC) interventions and was displaying clinical improvement that no longer warranted further RTC. Given he required ongoing work with sobriety and anxiety, continued motivational interviewing, individual, group, and family work could have been considered at an intensive outpatient program or partial hospitalization program level of care. Psychological testing conducted on 01/26/21 was not medically necessary for dates of service 03/05/21-11/13/21. It was a clinical service provided while the member was at another RTC program.[172]

---

[169] Rec. 5311–12.
[170] Rec. 5312.
[171] Rec. 11460.
[172] Rec. 7523–26.

None of these letters address or engage with the opinions that C.M.'s primary therapist at Blue Ridge, Mr. Riewald, provided in the March 4, 2021 Discharge Summary. Specifically, Mr. Riewald opined on C.M.'s progress regarding C.M.'s social skills, anxiety, and depression[173] and stated that he

> remain[ed] concerned regarding [C.M.]'s risk for relapsing in the areas of conduct problems, social difficulties, depressive symptoms, anxiety and substance abuse if he were to return to his home environment after completing our program. I believe that if any long-term gains are to be made, he must be in a residential or therapeutic boarding school setting after Blue Ridge so that he can practice and internalize the tools he learned at Blue Ridge. Returning to his home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to his previous level of functioning. . . . Returning home, even for a few days, would place him at great risk for a regression in functioning and would undo much of the progress that he has made at Blue Ridge.[174]

BlueCross's denial letters for Crossroads provide no insight as to why C.M.'s risk of relapsing was low enough to return to his home environment even with intensive outpatient therapy. Nor do they otherwise engage with Mr. Riewald's opinion that treatment in a residential or therapeutic boarding school setting was necessary for C.M. to internalize the tools he learned at Blue Ridge. And they address none of the negative descriptions of C.M.'s progress noted in the Discharge Summary. Notably, the Discharge Summary was written on March 4, 2021—the day before C.M. enrolled at Crossroads. Of course, BlueCross did not have to defer to the opinions of Mr. Riewald; however, it could not arbitrarily refuse to "engage with and address" them.[175] "By not providing an explanation for rejecting or not following these opinions, that is, not 'engaging' with these opinions, [BlueCross] effectively 'shut its eyes' to readily available medical information."[176]

---

[173] *See supra* "Admission and Care at Crossroads."
[174] Rec. 999.
[175] *D.K.*, 67 F.4th at 1237.
[176] *Id.*

Additionally, ERISA requires that "any health conclusions [made by a plan administrator] must be backed up with reasoning and citations to the record."[177] BlueCross failed to grapple with the specific facts that could have justified awarding benefits. The beneficiary and the court are left with no way of discerning the degree to which BlueCross engaged with the record.

Specifically, the denial letters do not reference policy terms and fail to cite with specificity any of C.M.'s medical records. For example, in addition to failing to address any of the statements Mr. Riewald made in the Discharge Summary, none of BlueCross's denial letters engage with Plaintiffs' assertion on appeal that C.M. was consistently nonresponsive during past therapy sessions or that a therapeutic day school "didn't think [C.M.] was a good fit for their program and that he needed more help than they could provide."[178]

BlueCross's claims processing here was not a "full and fair review" of C.M.'s record, nor did BlueCross provide Plaintiffs with a "meaningful dialogue." Accordingly, Defendants' denial of coverage for treatment at Crossroads was arbitrary and capricious.

### D.    Remand for Further Consideration

Having determined that Mueller, through its third-party administrator, BlueCross, acted arbitrarily and capriciously when it failed to comply with ERISA's claims processing requirements, the court must decide whether to remand for the plan administrator's "renewed evaluation of the claimant's case" or to award benefits.[179] This decision "hinges on the nature of the flaws in the administrator's decision."[180] Typically, "remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds

---

[177] *David P.*, 77 F.4th at 1312 (citing 29 C.F.R. § 2560.503-1(g)(1)(v)(B)).
[178] Rec. 3743–45.
[179] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1193).
[180] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1229 (10th Cir. 2021).

for the decision."[181] "But if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[182] If the record contains both evidence supporting Plaintiffs' claims for benefits and evidence supporting the denial of benefits, it cannot be said that the record "clearly shows" that the claimant is entitled to benefits.[183]

If benefits are not awarded, remand is proper. The court now turns to whether the "record clearly shows" that coverage for C.M.'s care at Blue Ridge and Crossroads is warranted.

Here, BlueCross did not provide C.M. a "full and fair review."[184] It rejected, without meaningful explanation or record support, Plaintiffs' arguments that C.M.'s treatment was medically necessary based on, for example, C.M.'s Discharge Summary and Plaintiffs' assertions that treatment at lower levels of care either could not be obtained (e.g., at a therapeutic day school) or did not result in meaningful improvement (e.g., at past therapy sessions). BlueCross also failed to meaningfully explain why Blue Ridge was excluded under the Plan's terms and MCG Guidelines. But the court cannot conclude that the "'record clearly shows' Plaintiffs are entitled to benefits, nor can [it] say that Plaintiffs are clearly not entitled to the claimed benefits."[185]

Remand is thus the proper remedy. A remand, however, "does not provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record, and not previously conveyed to plaintiffs."[186] On remand, Mueller (or its

---

[181] *David P.*, 77 F.4th at 1315 (cleaned up); *see id.* (citing *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012)) ("[R]emand is more appropriate where plan administrator failed to make adequate factual findings or failed to explain adequately the grounds for its decision to deny benefits, but not if the administrator instead gave reasons that were incorrect"); *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (concluding remand as the proper remedy when the "problem is with the integrity of [the plan administrator]'s decision-making process").

[182] *David P.*, 77 F.4th at 1315 (cleaned up).

[183] *David P.*, 77 F.4th at 1314 n.17.

[184] 29 U.S.C. § 1133(2).

[185] *David P.*, 77 F.4th at 1315.

[186] *Id.*

third-party administrator) must provide meaningful explanation regarding if Blue Ridge is excluded under the Plan's terms and MCG Guidelines. If BlueCross does not so find, then it should conduct a medical necessity analysis. Regarding this reevaluation, Defendants are instructed to be specific and to reference relevant record materials.

As to Crossroads, Mueller (or its third-party administrator) is limited to reevaluating whether C.M. is entitled to benefits for his treatment at Crossroads based on medical necessity. In this reevaluation, Mueller must engage with Plaintiffs' medical records that might support an award of benefits, such as the Discharge Summary, Plaintiffs' arguments regarding C.M.'s past treatment at lower levels of care, and any other pertinent medical records. In doing so, Mueller must engage with and provide record citations to facts that support and contradict its ultimate benefits determination.

### E.   Attorney's Fees

Plaintiffs request an award of attorney fees and costs under 29 U.S.C. § 1132(g) in the event that the court finds them to be the prevailing party in this litigation.[187] In an ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to any party."[188] In the Tenth Circuit, "[a] fee claimant need not be a prevailing party to be eligible for an award of attorney's fees and costs under ERISA."[189] Instead, a district court has the discretion to award fees "as long as the fee claimant has achieved 'some degree of success on the merits.'"[190] To decide whether a fee claimant is deserving of an award of attorney's fees and costs, a district court "may consider" five different factors:

---

[187] Pls.' MSJ 41–42.
[188] 29 U.S.C. § 1132(g)(1).
[189] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010)).
[190] *Id.* (quoting Hardt, 560 U.S. at 255).

(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.[191]

Plaintiffs may file a motion within thirty (30) days of the date of this Order demonstrating why an award of attorney fees and costs is appropriate, along with support for the amount of the requested relief and the support for same.

## ORDER

Accordingly, the court GRANTS IN PART and DENIES IN PART the parties' cross-motions for summary judgment.[192] The court GRANTS Plaintiffs' motion for summary judgment for violating ERISA's meaningful dialogue requirement and REMANDS the benefits determination for C.M.'s treatment at Blue Ridge and Crossroads to Mueller and Blue Cross for further review consistent with this Memorandum Decision and Order. Plaintiffs' motion for summary judgment is otherwise DENIED. The court further GRANTS summary judgment in favor of Mueller with respect to Plaintiffs' abandoned MHPAEA claim. Mueller's motion for summary judgment is otherwise DENIED.


Signed March 3, 2025.

BY THE COURT

_____
David Barlow
United States District Judge

---

[191] *Id.*
[192] ECF Nos. 34, 36.

33